Filed 12/1/15 In the Matter of the Andersen Family Trust CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In the Matter of the ANDERSEN FAMILY TRUST. | B255546 |
| | (Los Angeles County Super. Ct. No. BP099392) |
| STEPHEN ANDERSEN et al., Petitioners and Respondents, v. PAULINE HUNT, Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, David J. Cowan, Judge. Affirmed.

Law Offices of Richard Pech, Richard Pech; Law Offices of Marc B. Hankin, Marc B. Hankin for Appellant.

Law Offices of John A. Belcher, John A. Belcher for Petitioners and Respondents.

Wayne Andersen died on April 28, 2006.  Since that time, his children, Stephen Andersen and Kathleen Brandt, have been engaged in a protracted legal battle with his long-term romantic partner, Pauline Hunt, and her grandson, Taylor Profita, over the disposition of assets held by the Andersen Family Trust (the trust) that Wayne[1] and his deceased wife Harriett Andersen[2] established in 1992.

These consolidated appeals are the product of two skirmishes concerning the trust's no contest clause, which the parties largely ignored for the first seven years of this litigation.  Pauline actively invoked the no contest clause for the first time in 2013, when she filed a petition contending that the clause should be enforced against petitions Stephen and Kathleen filed in 2006 and 2007.  After the probate court denied Pauline's petition to enforce the clause in 2014, Stephen and Kathleen responded with their own petition to enforce the clause against a petition for reformation Pauline filed in 2007.  The probate court denied their petition as well.  Both sides timely appealed the denials of their respective petitions, and we consolidated the related disputes for disposition.

We affirm.  With respect to Pauline's petition to enforce the no contest clause against Stephen and Kathleen (Pauline's appeal), we conclude that the petitions Stephen and Kathleen filed were indirect contests that did not trigger the no contest clause under the current version of the Probate Code, which we find applicable.  We further conclude that the petitions did not constitute prohibited contests under the older version of the Probate Code that Pauline seeks to apply.  With respect to Stephen and Kathleen's petition to enforce the no contest clause against Pauline (Stephen and Kathleen's appeal), we conclude that most of their contentions are barred by principles of finality and

---

[1] We refer to the parties by their first names for clarity.  No disrespect is intended.
[2] Documents in the record variously spell the name of Wayne's wife as "Harriett" and "Harriet."  When quoting from the record, we have left the spellings of the name unchanged.

appellate review.  Additionally, we conclude that the challenged petition filed by Pauline did not constitute a contest under the current or former versions of the Probate Code.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Nine years of continuous and contentious litigation between the parties (including two previous appeals and a writ proceeding before this court) have left in their wake a lengthy and complicated factual and procedural history.  We discuss only the portions of that history most pertinent to the instant disputes.

**I.      The Andersen Family Trust**

Wayne and Harriett settled the trust as co-trustors and co-trustees in 1992.  They were the sole trust beneficiaries during their lives.  The trust designated Stephen and Kathleen as trustees upon the incapacitation or death of both Wayne and Harriett.  It also provided that Stephen and Kathleen were to receive the trust assets in equal shares upon the death of both Wayne and Harriett.

The trust contained the following provisions relevant here:

" 3.1 On the death of either Trustor survived by the other Trustor, the trustee shall divide the trust estate (including any additions made by the Will of the deceased trustor or by any life insurance or employee benefit proceeds or otherwise) into two shares, designated Trust A and Trust B, each of which shall constitute and be held, administered and distributed by the trustee as a separate trust.

"3.2 CONTENTS OF TRUST A (Survivor's Trust):  Trust A shall consist of the following:

"The minimum pecuniary amount necessary to entirely eliminate, or to reduce to the maximum extent possible, any federal estate tax at the deceased trustor's death.  In making this determination, the trustee shall take into consideration all federal estate tax deductions and all federal estate tax credits other than those for state death taxes.

"This allocation to Trust A shall be satisfied in cash or kind, or partly in each, only with assets eligible for the marital deduction.  Assets allocated in kind shall be deemed to

3

satisfy this amount on the basis of their values as finally determined for federal estate tax purposes.

"The Trustee shall not allocate to Trust A assets having an aggregate fair market value at the date of allocation that is less than the marital deduction amount as finally determined for federal estate tax purposes.

"3.3 CONTENTS OF TRUST B (Deceased Spouse's Tax Credit Trust):

"Trust B shall consist of the balance of the trust estate plus any amount disclaimed on behalf of the surviving spouse."

"3.7 DISTRIBUTION OF INCOME AND PRINCIPAL OF TRUST B

"Any payment of the deceased trustor's debts and all administrative costs associated with the death of the deceased trustor shall be paid from the income and principal of Trust B."

"4.1 POWER TO AMEND:  During the joint lifetime of Trustors, this Trust may be amended in whole or in part by an instrument in writing, signed by both Trustors, and delivered to the Trustee. After the death of the first Trustor to die, the surviving Trustor may amend Trust A, in whole or in part, by an instrument in writing, signed by the Trustor and delivered to the Trustee.  After the death of the first Trustor to die, Trust B may not be amended by the surviving Trustor.

"4.2 POWER TO REVOKE:  During the joint lifetime of the Trustors, the Trustors may revoke the Trust with regard to the community property of the Trustors by an instrument in writing, signed by both Trustors jointly or by either Trustor alone.  Upon revocation, the Trustee shall deliver the trust property or the revoked portion of the trust property to both of the Trustors as the community property of both Trustors.

"After the death of the first Trustor to die, the surviving Trustor may revoke Trust A, in whole or in part, by an instrument in writing, signed by the Trustor and delivered to the Trustee. After the death of the first Trustor to die, Trust B may not be revoked by the surviving Trustor."

4

The trust also contained a no contest clause.  That clause, contained in paragraph 7.3, provided:

"In the event any beneficiary under this Trust shall, singly or in conjunction with any other person or persons, contest in any court the validity of this Trust, or of the provisions of the deceased Trustor's Last Will and Testament pertaining to this Trust, or shall seek to obtain an adjudication in any proceeding in any court, that this Trust, or any of its provisions, or that such Will or any of its provisions, is void, or seek otherwise to void, nullify or set aside this Trust, or any of its provisions, then the right of that person to take any interest given to him or her by this Trust shall be determined as it would have been determined had the person predeceased the execution of this Declaration of Trust. The Trustee is hereby authorized to defend, at the expense of the Trust Estate, any contest or other attack of any nature on this Trust or any of its provisions."

Harriett died on November 26, 1993.  Wayne did not divide the trust assets into separate A and B trusts upon her death or at any time thereafter.

## II.    The Trust Amendments

Wayne amended the trust five times after Harriett's death.  The first amendment, dated October 17, 1996, designated Pauline as the successor trustee upon Wayne's incapacitation or death.  Stephen and Kathleen were to succeed her as co-trustees.

Wayne suffered a stroke on May 11, 2003.  Seventeen days later, on May 28, 2003, Wayne executed a second amendment to the trust.  This amendment provided: "This Addenda to the Andersen Family Trust is made for the following purpose:  [¶] Trustor does hereby change the distribution of the trust assets upon his death as follows: [¶]  60% of the residue of the trust estate shall be distributed to Pauline S. Hunt, a very dear friend of trustor.  [¶]  The remaining 40% of the residue of the trust estate shall be distributed in three equal shares, one for Stephen E. Andersen, Kathleen L. Brandt, and John Andersen, trustor's children and grandson.  [¶]  Trustee does state that when the trust originated it was an AB trust.  Trustor states there are no assets in decedent's Trust B, and that all assets are in trustor's Survivor's Trust, Trust A.  Trust B was never funded

5

and it is the intent of the trustor and was the intent of the trustors prior to the demise of Harriet Andersen, that upon the death of the first trustor, the surviving trustor had the right to place assets in trust B if said surviving trustor wanted to, in order to save taxes and that trust B was only for a tax credit trust. The above distribution is to be made from the entire assets of the Andersen Family Trust. [¶] Except as so amended, Trustor re-affirms the Living Trust and any Addendas made thereto."

Wayne amended the trust a third time on November 18, 2003. In this amendment, Wayne restated that Pauline was to succeed him as trustee "upon his demise." "[S]hould she be deceased, or unable to act, then Sunny Charla Asch shall act as such successor trustee, and should Sunny be unable to act, then Noella Ballenger, shall act as such trustee." This amendment thus removed Stephen and Kathleen as successor trustees. It also provided that "none of trustor's children or grandson have any involvement with the handling of said trust assets. Further the trustee is directed to sell the residence and in no way shall trustor's son, Stephen[,] or his daughter, Kathleen[,] or his grandson, John, be allowed to purchase the residence, either directly or indirectly." The amendment restated the 60-40 asset allocation between Pauline and Stephen, Kathleen, and John set forth in the previous amendment. It further added Pauline's grandson Taylor as a beneficiary if Pauline predeceased Wayne: "Should Pauline Hunt predecease testator, then the trust assets shall be distributed as follows: [¶] Twenty-five percent (25%) to Taylor Profita, of the residue of the trust assets[;] [¶] Seventy-five percent (75%) of the residue of the trust assets shall be distributed to Stephen E. Andersen, Kathleen L. Brandt and John Andersen to share and share alike. [¶] Should Taylor predecease testator, then the entire residue of the trust assets shall go to Stephen, Kathleen and John to share equally. If any of these three are deceased, such share or shares shall go to the survivors remaining."

The fourth amendment, dated January 24, 2004, was identical to the second amendment. But it had handwritten crosshatching over the first four paragraphs (concerning the 60-40 division of assets between Pauline and Wayne's family), along with a handwritten note stating, "Already superseded by amendment dated 11/18/03."

6

The remaining portion of the fourth amendment concerned the A and B trusts and provided, as the second amendment did, that "Trustee does state that when the trust originated it was an AB trust.  Trustor states there are no assets in decedent's Trust B, and that all assets are in trustor's Survivor's Trust, Trust A.  Trust B was never funded and it is the intent of the trustor and was the intent of the trustors prior to the demise of Harriet Andersen, that upon the death of the first trustor, the surviving trustor had the right to place assets in trust B if said surviving trustor wanted to, in order to save taxes and that trust B was only for a tax credit trust. The above distribution is to be made from the entire assets of the Andersen Family Trust.  [¶]  Except as so amended, Trustor re-affirms the Living Trust and any Addendas made thereto."  Wayne also added a handwritten notation to the trust document:  "Resigned this 24th day of January 2004 – to make this an original."

Wayne made the fifth and final amendment to the trust on July 6, 2004.[3]  That amendment provided: "This Addenda is made for the following purpose:  [¶]  Trustor deletes his grandson from receiving a part of the assets of the trust, and instead, the percentage going to trustor's son, daughter and grandson, shall now only go to trustor's son and daughter, so Steve will have the portion that had been set aside for his son.  [¶] Except as so amended, trustor re-affirms his Living Trust and any amendments thereto."

III.    **Wayne's Death and Ensuing Litigation**

Wayne suffered a second major stroke on February 7, 2006.  He died on April 28, 2006.

---

[3] On May 19, 2005, in the presence of attorney Jeffers, Wayne executed a declaration reaffirming the trust and amendments thereto.  The declaration also stated that "The understanding we had as to that trust is that a decedent's trust would only be set up in the event it was necessary for estate tax purposes. Since there was no need for this particular purpose, all assets of the Trust are in the survivor's trust, being myself, and I have the right and have made changes in the testamentary plan which I intend that my successor trustee carry out."

### A. Petitions Filed by Stephen and Kathleen

On July 11, 2006, Stephen and Kathleen initiated the instant litigation by filing a document entitled "Petition for Recovery of Trust Property and Accounting; Petition to Enforce Written Trust in Real Property; Petition to Impose Constructive Trust Upon Funds Diverted from Irrevocable Trust" pursuant to Probate Code section 17200.[4]  In their petition, Stephen and Kathleen alleged that Wayne violated his fiduciary duty by "convert[ing] to his own use and control assets which should have been held in trust for Petitioners Stephen Andersen and Kathleen Brandt under the 'B' trust provisions."  They further alleged that the trust became irrevocable upon Harriett's death in 1993 and that the January 24, 2004 amendment could not modify Wayne's obligation to fund the B trust and accordingly was null and void.  They sought damages for conversion and breach of fiduciary duty, the imposition of a constructive trust on Harriett's interest in the family home, and an accounting.

Stephen and Kathleen subsequently amended their petition three times.  All three amended petitions retained the allegations and causes of action asserted in the first petition. The second and third amended petitions added causes of action for elder neglect and financial elder abuse against Pauline and Taylor, as well as a cause of action for breach of fiduciary duty against Pauline in her capacity as trustee.  The third amended petition, filed on October 8, 2007, became the operative petition for purposes of trial.  In addition to the allegations and claims contained in the previous versions, the third amended petition sought a declaration that "the entirety of the estate of Wayne Andersen, pursuant to his will, became property of 'Trust B' and held in Trust for the two identified beneficiaries, Kathleen Brandt and Stephen Andersen."  In the alternative, Stephen and Kathleen's third amended petition asked the court to declare that "subsequent written actions of Wayne Andersen reaffirmed his intention to keep the Andersen Family Trust . . . in its original form as executed by Harriett Andersen and Wayne Andersen," and "that

---

[4] All further statutory references are to the Probate Code unless otherwise indicated.

any purported amendments to the Trust are null and void as products of undue influence, of a lack of testamentary capacity and of financial elder abuse[.]"

## B.    Petition Filed by Pauline

A few days after Stephen and Kathleen filed their third amended petition, Pauline, in her capacity as trustee, filed a section 17200 petition seeking construction of the trust, determination of the validity of the amendments, and reformation of paragraph 3.2 of the trust ("CONTENTS OF TRUST A (Survivor's Trust)").  Pauline alleged that when Wayne and Harriett settled the trust, they "intended that they would have control over their assets during the lifetime of both spouses and that the surviving spouse would have control after the death of the first spouse to die, and that the surviving spouse would have the option to disclaim assets into a credit shelter trust after the death of the first spouse to die if conditions warranted the establishment of a credit shelter trust (Trust B) at that time in the surviving spouse's discretion."  In support of this contention, Pauline attached a copy of a "script" that the trust drafter, attorney Eva Jeffers, read to Wayne and Harriett before they executed the trust.  The script stated in pertinent part that "If there is no need for any tax advantage then there will be no Trust B. . . ."  [¶]  "The surviving spouse has full control over all assets of the trust and makes the election of Trust A and Trust B upon the death of the first spouse as said surviving spouse shall determine in said spouse's absolute discretion."

Pauline also sought to reform paragraph 3.2 of the trust to reflect the alleged intent of Wayne and Harriett.  She proposed two revisions, the first of which added language to the existing version of paragraph 3.2 and the second of which entirely replaced the existing version of paragraph 3.2.

## C.    The Trial

The probate court bifurcated for trial the issues presented in the dueling petitions. The phase I trial addressed construction, interpretation, and reformation of the trust; the phase II trial addressed the claims of lack of capacity, undue influence, and elder abuse, as well as a motion Stephen and Kathleen made to remove Pauline as trustee.

9

### 1. Phase I

The probate court tried the phase I issues over nine days from October 2007 to March 2008. The court issued a written statement of decision regarding phase I on July 29, 2008. In that statement of decision, the court rejected Stephen and Kathleen's claims that Wayne and Harriett intended the trust to be irrevocable upon Harriett's death. The court found that "Wayne's original intent and understanding in executing the Trust was that the survivor have the option to fund Trust B." The court further found that the conduct of Wayne and attorney Jeffers in the years following Harriett's death "was consistent with their understanding that Wayne had no obligation to fund Trust B and was free to continue to treat the Trust as a modifiable, revocable Trust," and that such conduct "was consistent with the intent and meaning of the Trust." The court made "these determinations and interpretations of the Trust instrument having found that there exist numerous patent and latent ambiguities in the instrument." Citing its difficulty reconciling the language of the trust, the parties' conflicting interpretations of that language, and the trial testimony of attorney Jeffers and another witness, the court "concluded that the funding provisions for Trust A and Trust B are contradictory, confused, indefinite, and ambiguous."

As to Pauline's request for reformation, the probate court stated that it was "inclined to reform the Trust to clarify the primary ambiguity with regard to the funding of Trust B by adopting the proposed revision of section 3.2" set forth in Pauline's petition. The court nonetheless "decline[d] to issue a final judgment of reformation at this time, deferring same pending conclusion of the Phase II trial." The court ended its statement of decision with a directive that the findings and orders contained therein "shall be law of the case pending conclusion of the Phase II trial and shall be incorporated in the final judgment."

### 2. Phase II

Phase II of the trial occurred over several days in 2008. The court delivered an oral tentative statement of decision on March 25, 2009. In that tentative statement, the

court found that Wayne had the capacity to execute the final four trust amendments and was not unduly influenced by Pauline when he did so. It also found, however, that Wayne "'lacked financial capacity since at least January 2004, and lacked the capacity to understand or appreciate the significance or ramifications of placing personal assets in joint tenancy accounts with Hunt'" and accordingly ruled that the establishment of several joint bank accounts was void ab initio. The court removed Pauline as trustee on April 15, 2009 and ordered a referee to prepare a supplemental accounting.

The court issued a second, written tentative statement of decision on August 12, 2009. This statement of decision differed from the March oral tentative in important ways. Notably, the court found that Wayne lacked the capacity both to make the final four trust amendments and to convey financial assets to Pauline. The court found that Wayne trusted and was dependent upon Pauline, who took unfair advantage of him but did not physically neglect him.

The court entered judgment in accordance with its August tentative on October 15, 2009. The court's "declaratory judgment" noted that "the court filed a Phase I Statement of Decision on July 29, 2008 finding that the subject trust remained modifiable following the death of Wayne Andersen's spouse, Harriet. The court declined to reform the trust language; Hunt later stipulated to abandon the request for formal reformation of the trust given the court's findings in the Phase I Statement of Decision." The court expressly reiterated its phase I findings that "[t]here was no breach of fiduciary duty by Wayne Andersen in failing to put the assets of Harriet Andersen in a separate B Trust," and that "[t]he claims and [*sic*] wrongdoing by Wayne Andersen in [Stephen and Kathleen's] third amended petition were not sustained by the evidence." The court also found that the "statutory elder abuse claims" against Pauline and Taylor were not sustained by the evidence.

### D. The Appeal

Pauline timely appealed the October 15, 2009 judgment. She challenged the court's application of the contractual rather than testamentary standard of capacity, as

11

well as its findings regarding Wayne's capacity to amend the trust and her undue influence in bringing about the amendments and asset transfers. She did not challenge any of the court's phase I findings, including those concerning the revocability of the trust and the funding of the B trust. Stephen and Kathleen did not file a cross-appeal or otherwise place the court's phase I findings at issue.

In the published portion of the lengthy opinion we issued on June 4, 2011, we concluded that the probate court erred in evaluating Wayne's capacity to execute the trust amendments by the standard of contractual capacity rather than the standard of testamentary capacity. (*Andersen v. Hunt* (2011) 196 Cal.App.4th 722, 726, 731.) In the unpublished portion, we concluded that there was no substantial evidence that Wayne lacked the requisite testamentary capacity when he amended the trust in 2003 and 2004. We further concluded that there was no substantial evidence that the 2003 and 2004 amendments were the product of undue influence by Pauline. We accordingly concluded that the 2003 and 2004 amendments were valid and directed the probate court to enter a new and different judgment affirming the validity of the trust amendments. (*Andersen v. Hunt*, *supra*, 196 Cal.App.4th at p. 732.) We affirmed the court's ruling in all other respects. (*Id.*)

On remand, the probate court issued a judgment that the 2003 and 2004 trust amendments were valid. That judgment was filed on May 2, 2012.

### E.    The Malicious Prosecution Suit

In October 2011, after we issued our opinion and remittitur but before the probate court entered its revised judgment, Pauline and Taylor filed a malicious prosecution suit against Stephen, Kathleen, and their attorney, John A. Belcher. Pauline and Taylor alleged that Stephen, Kathleen, and Belcher all acted without probable cause when Belcher filed Stephen and Kathleen's second amended petition claiming that Pauline and Taylor engaged in elder neglect. Pauline and Taylor alleged that the proceedings on that claim were terminated in their favor on October 15, 2009, when the probate court issued its final judgment.

12

Belcher filed an anti-SLAPP motion to strike the complaint against him pursuant to Code of Civil Procedure section 425.16.[5]  The court entered an order granting Belcher's anti-SLAPP motion on October 10, 2012.  In that order, the court found that Belcher's conduct in filing claims against Pauline and Taylor on behalf of his clients Stephen and Kathleen was protected conduct.  In light of that finding, the court noted that the burden shifted to Pauline and Taylor to demonstrate a probability of prevailing on the claims.  The court found that Pauline and Taylor failed to meet that burden because they did not oppose Belcher's anti-SLAPP motion.

The court struck the complaint in its entirety as to Belcher, dismissed the claims and action against him with prejudice, and indicated that he was entitled to attorney's fees and costs upon noticed motion.  Belcher subsequently filed and noticed a motion for attorney's fees and costs, which the court granted.  The court later dismissed the malicious prosecution claims against Stephen and Kathleen without prejudice due to lack of prosecution.  Neither Pauline nor Taylor appealed.

### F.    The No Contest Clause Petitions

#### 1.    Petition Filed by Pauline

In her 2007 petition, Pauline mentioned the trust's no contest clause and stated that it would "be the basis of a separate petition after judgment is entered in this case." Pauline eventually followed through with this promise by filing a petition to enforce the no contest clause on July 22, 2013, more than a year after the court entered judgment on remand, almost four years after the court entered judgment after trial, and approximately seven years after the litigation began. She filed the operative first amended verified petition on September 19, 2013.  Pauline alleged that all four of the petitions Stephen and Kathleen filed in 2006 and 2007 contained allegations that violated the no contest clause.[6]

_____

[5] SLAPP is an acronym for Strategic Lawsuit Against Public Participation.

[6] Although former Probate Code section 21320, subdivision (a) permitted beneficiaries to "apply to the court for a determination of whether a particular motion, petition, or other act by the beneficiary . . . would be a contest within the terms of the no contest clause," none of the parties in this case took advantage of this "safe harbor"

13

She claimed that Stephen and Kathleen attempted to "nullify and thwart the Trust provisions concerning subtrusts and the power to amend, to violate the settlors' estate plan contained in the Trust, in addition to nullifying Wayne's clearly stated intent to Stephen and Kathleen (and his estate planning attorney, Jeffers) that he had exercised his power to amend under the Trust by giving Pauline 60% of the trust assets upon his death." Pauline attached a chart summarizing thirteen allegations Stephen and Kathleen made in all iterations of their petitions that in her view violated the no contest clause. The challenged allegations pertain to the A and B trusts, the revocability of the trust, and Wayne's power to amend the trust.

Stephen and Kathleen objected to Pauline's petition, though notably not on laches or other untimeliness grounds. They argued that their allegations were supported by probable cause and, further, that "the existence of probable cause is res judicata" in light of the resolution of the malicious prosecution suit, in which they claimed the court "found that this action was filed with probable cause." (They asked the court to take judicial notice of the complaint and order granting Belcher his attorney's fees in that case. In the alternative, they argued that the "interim adverse judgment rule" also operated to conclusively establish that their petitions were supported by probable cause. In support of this argument, they pointed to the trial court's rulings that Wayne lacked the capacity to amend the trust and transfer assets, and that Pauline took unfair advantage of Wayne and exercised undue influence over him. Stephen and Kathleen also argued that the allegations contained in their petitions did not constitute a prohibited contest under

---

provision (*Donkin v. Donkin* (2013) 58 Cal.4th 412, 419 (*Donkin*)) before filing the petitions now being challenged as violative of the no contest clause. We share the incredulity expressed by the probate court regarding the parties' failure to take advantage of the safe harbor provision.

14

the former Probate Code provisions in effect when they filed their petitions.[7]  Pauline disputed these arguments in a reply filing.

The parties stipulated that Temporary Judge David J. Cowan could adjudicate the dispute regarding Pauline's no contest clause petition.  Judge Cowan held a hearing on December 13, 2013.  After the hearing, Judge Cowan requested supplemental briefing on *Donkin v. Donkin*, *supra*, 58 Cal.4th 412, which the Supreme Court decided after the parties submitted the instant dispute.  Both sides filed supplemental briefs addressing *Donkin*.

Judge Cowan issued a comprehensive 21-page ruling denying Pauline's petition on February 6, 2014.  He analyzed the petition under both current Probate Code, sections 21310 and 21311, and former Probate Code sections 21300 and 21305.  The current law provides in pertinent part that "A no contest clause shall  . . . be enforced against . . . [¶] a direct contest that is brought without probable cause."  (§ 21311, subd. (a)(1).)  Judge Cowan concluded that Stephen and Kathleen did not bring a "direct contest" within the meaning of section 21310, subdivision (b).  Instead, he found that Stephen and Kathleen "were only arguing *indirectly* that the Trust's provisions . . . were not valid and should be set aside."  Even if their allegations amounted to a direct contest, Judge Cowan reasoned, Stephen and Kathleen did not violate the no contest clause because their allegations were supported by "probable cause" as defined in section 21311, subdivision (b).  In reaching this conclusion, Judge Cowan observed that the plain language of the trust supported the positions taken by Stephen and Kathleen.  He further noted that the probate court that tried the case concluded that the trust was ambiguous, which itself indicated it would be reasonable for Stephen and Kathleen to advance the position asserted in their petitions.

Judge Cowan also considered whether the former Probate Code should govern in light of the "fairness exception" set forth in Probate Code section 3, subdivision (h) and

_____

[7] As discussed more fully below, the Legislature repealed Probate Code sections 21300-21308 and replaced them with Probate Code sections 21310-21315 during the pendency of this litigation.

15

discussed in *Donkin*, *supra*, 58 Cal.4th at pp. 416, 432-438. That exception applies where "application of the former law would compel a different conclusion as to enforceability of a no contest clause and it is established that the trustor(s) of the trust instrument drafted the no contest clause in reliance on the former law." (*Donkin*, *supra*, 58 Cal.4th at p. 416.) Judge Cowan concluded the fairness exception was not applicable because the result would be the same under several of the public policy exceptions found in former section 21305, subdivision (b).

Pauline timely appealed on April 7, 2014.

### 2. Petition Filed by Stephen and Kathleen

The same day Pauline filed her notice of appeal, Stephen and Kathleen filed a petition seeking to enforce the no contest clause against her.[8] They asserted that the petition for reformation Pauline filed in 2007 violated the no contest clause under both the current and former Probate Codes. Stephen and Kathleen did not analyze the current Probate Code, however. Instead, invoking the fairness exception, they contended that "application of the old law would compel a different conclusion as to enforceability of the no contest clause because the reformation is an attack on how Trust A and Trust B would be funded, it does not seek to interpret. Trust A was revokable [*sic*] and Trust B was not revokable [*sic*]; Pauline's reformation would invalidate the Trust as drafted. The Trust manifestly and unambiguously demonstrates that neither Wayne nor Harriett intended that the Trust be funded in the manner Pauline alleges in her reformation. Also, it is without controversy that Wayne and Harriett prepared the Trust before the current law was even contemplated, and that the Trust became irrevocable before the change in the law and hence both elements [of the fairness exception] are satisfied."

---

[8] Approximately one week later, they also filed a verified petition to enforce against Pauline a no contest clause contained in Wayne's will. Although the probate court denied this petition, and Stephen and Kathleen included the filings pertinent to this petition in their clerk's transcript, they make no mention of the petition in their briefing. We accordingly do not consider whether the court properly denied the petition to enforce the no contest clause contained in the will. (See, e.g., *Estate of Sobol* (2014) 225 Cal.App.4th 771, 783.)

16

Pauline objected. Just as Stephen and Kathleen ignored the delayed nature of Pauline's no contest clause petition, Pauline likewise ignored the lapse of time between the filing of her petition seeking reformation in 2007 and Stephen and Kathleen's petition to challenge it in 2014. She instead argued that her request for reformation could not be a contest because it was successful. In the alternative, she argued that her petition should be governed by current section 21311 and was not a contest within the meaning of that statute.

In their reply, Stephen and Kathleen argued that the B trust became irrevocable upon Harriett's death in 1993 and that Wayne "ignored his duties, in effect giving himself control over assets that needed division under the formula." They further contended that Pauline's proposed amendment to paragraph 3.2 of the trust "sought to rewrite the language of the original Andersen Family Trust" and "was inconsistent with both the Trust and the amendments."

The parties stipulated that Temporary Judge Brenda Penny could adjudicate the no contest clause petition. Judge Penny held a hearing on July 24, 2014. Both sides briefly summarized the arguments they made in their written filings. Judge Penny indicated that she understood the parties' positions and took the matter under submission.

On August 12, 2014, Judge Penny issued a minute order summarily denying the petition. Her ruling, in its entirety, stated: "The Court has reviewed Petitioner Stephen Andersen and Kathleen Brandt's Petition to Enforce the No Contest Clause in the Trust and Pauline Hunt's Objections thereto. The Court has also reviewed the No Contest Clause in the Trust. The court finds that the filing of Pauline Hunt's Petition for Construction of the Andersen Family Trust did not violate the No Contest Clause."

Stephen and Kathleen timely appealed on October 7, 2014.

## DISCUSSION

### I. Standard of Review

The parties agree that the de novo standard of review applies. Where the applicability of a no contest clause is at issue and there are no disputed facts, we perform

17

a de novo review.  (*Bradley v. Gilbert* (2009) 172 Cal.App.4th 1058, 1068; see also *Burch v. George* (1994) 7 Cal.4th 246, 254 (*Burch*); *In re Estate of Coplan* (2004) 123 Cal.App.4th 1384, 1388.)  We also perform a de novo review when interpreting the Probate Code.  (*Jenkins v. Teegarden* (2014) 230 Cal.App.4th 1128, 1138.)

## II.　　No Contest Clauses under Former and Current Probate Code Provisions

A no contest clause in a will or trust instrument places conditions upon the gifts and dispositions made in the instrument.  (*Burch*, *supra*, 7 Cal.4th at p. 254.)  These conditions may be harsh: a no contest clause "essentially act[s] as a disinheritance device, i.e, if a beneficiary contests or seeks to impair or invalidate the trust instrument or its provisions, the beneficiary will be disinherited and thus may not take the gift or devise provided under the instrument."  (*Id.* at p. 265; see also *Donkin*, *supra*, 58 Cal.4th at p. 422.)  Despite their harshness, no contest clauses long have been held valid because they promote the public policies of discouraging litigation and effectuating the intent of the donor.  (*Donkin*, *supra*, 58 Cal.4th at p. 422; *Burch*, *supra*, 7 Cal.4th at p. 254.)  The Legislature first codified common law principles governing no contest clauses in the Probate Code in 1989 (*Donkin*, *supra*, 58 Cal.4th at p. 423), and it has continued to refine and revise those statutes periodically (see *id.* at pp. 423-426).

Crucial to this case are statutory changes the Legislature enacted during its pendency.  When this case was initiated in 2006, no contest clauses were governed by former Probate Code sections 21300-21308 and 21320-21322.  As is pertinent here, those provisions distinguished between "direct contests" and "indirect contests" to testamentary instruments.  A "direct contest" was defined as "a pleading in a proceeding in any court alleging the invalidity of an instrument or one or more of its terms based on one or more" of 10 enumerated grounds.  (Former § 21300, subd. (b).)  An "indirect contest" was defined as "a pleading in a proceeding in any court that indirectly challenges the validity of an instrument or one or more of its terms based on any other ground not contained in [former section 21300,] subdivision (b), and that does not contain any of those grounds."  (Former § 21300, subd. (c).)  The Supreme Court  further clarified that "indirect" contests

included those that "attack[ed] the validity of an instrument by seeking relief inconsistent with its terms" (*Johnson v. Greenelsh* (2009) 47 Cal.4th 598, 605) and sought to thwart the distributive scheme established by the transferor (*Johnson, supra*, at p. 606; see also *Donkin*, *supra*, 58 Cal.4th at p. 433).

The former Probate Code generally permitted the enforcement of no contest clauses against most direct and indirect contests. Former sections 21305 and 21306 contained some exceptions to this general rule, however. As is pertinent here, former section 21305 prohibited the enforcement of no contest clauses against certain types of indirect contests (former § 21305, subd. (e)) "as a matter of public policy" (former § 21305, subd. (b)). The "public policy exemption[]" (*Donkin*, *supra*, 58 Cal.4th at p. 424, fn. 7) prohibited the enforcement of no contest clauses against indirect contests "challenging the exercise of a fiduciary power" (former § 21305, subd. (b)(6)), "regarding the interpretation of the instrument containing the no contest clause or an instrument or other document expressly identified in the no contest clause" (former § 21305, subd. (b)(9)), and "regarding the reformation of an instrument to carry out the intention of the person creating the instrument" (former § 21305, subd. (b)(11)).

The Legislature repealed these provisions in 2008 and replaced them "with a new set of statutes governing no contest clauses." (*Donkin*, *supra*, 58 Cal.4th at p. 426.) The new statutes, codified at current sections 21310-21315, differ substantially from their predecessors. Current section 21310, subdivision (b) narrows the definition of "direct contest" to include "a contest that alleges the invalidity of [an instrument containing a no contest clause] or one or more of its terms, based on one or more" specified grounds.[9] More importantly, section 21311, subdivision (a)(1) provides in pertinent part that "[a] no contest clause shall only be enforced against . . . [¶] [a] direct contest that is brought without probable cause." Thus, under the provisions of the current law potentially

---

[9] Pleadings alleging misrepresentation and mistake were considered direct contests under the former Probate Code (former § 21300, subds. (b)(4), (b)(8)), but do not fall within the definition of direct contest contained in the current Probate Code (see § 21310, subd. (b)).

19

relevant to this case, a no contest clause is not enforceable against a pleading unless the pleading is a direct contest brought without probable cause. Contests that would have been considered "indirect contests" under the former law cannot be barred by a no contest clause under the current law. "Probable cause" exists for purposes of section 21311 "if, at the time of filing a contest, the facts known to the contestant would cause a reasonable person to believe that there is a reasonable likelihood that the requested relief will be granted after an opportunity for further investigation or discovery." (§ 21311, subd. (b).)

The current law became effective on January 1, 2009 and operative on January 1, 2010. (*Donkin*, *supra*, 58 Cal.4th at p. 426.) The general rule for purposes of the Probate Code is that "a new law applies on the operative date to all matters governed by the new law, regardless of whether an event occurred or circumstance existed before, on, or after the operative date, including, but not limited to, creation of a fiduciary relationship, death of a person, commencement of a proceeding, making of an order, or taking of an action." (§ 3, subd. (c).)

Additionally, by its terms, the current statutory scheme governing no contest clauses "applies to any instrument, wherever executed, that became irrevocable on or after January 1, 2001" (§ 21315, subd. (a)), and "does not apply to an instrument that became irrevocable before January 1, 2001" (§ 21315, subd. (b)). The Supreme Court nonetheless has recognized "that a party may be able to qualify for a fairness exception (§ 3, subd. (h)) to the presumptive applicability of the current law to instruments that became irrevocable after January 1, 2001, if application of the former law would compel a different conclusion as to enforceability of a no contest clause and it is established that the trustor(s) of the trust instrument drafted the no contest clause in reliance on the former law." (*Donkin*, *supra*, 58 Cal.4th at p. 416; see also *id.* at p. 433.)

III. **The Current Probate Code Applies**

In light of the revisions to the Probate Code, the date the trust became irrevocable is the starting point for our analysis. This date governs which version of the Probate Code applies. If the trust became irrevocable before January 1, 2001, the former Probate

20

Code applies. (§ 21315, subd. (b).) If it became irrevocable on or after January 1, 2001, the current Probate Code applies. (§ 21315, subd. (a).)

In the response brief they filed in Pauline's appeal, in which they defend Judge Cowan's ruling that their allegations did not violate the no contest clause, Stephen and Kathleen contend that "Wayne Andersen died in April 2006, and at that point the trust became irrevocable." They take a different position in their own subsequent appeal, however, arguing that the trust became irrevocable upon Harriett's death in 1993.[10] Pauline uniformly contends that the trust became irrevocable upon Wayne's death in 2006.

In 2008, after phase I of the bifurcated trial, the trial court determined that the trust became irrevocable upon Wayne's death in 2006. Specifically, it concluded that the trust remained revocable after Harriett's death and that Wayne did not breach any fiduciary duties or engage in any actionable conduct by failing to put assets into a separate B trust. Stephen and Kathleen did not appeal or cross-appeal those rulings.

Pauline now takes the position that the trial court's determination that the trust became irrevocable in 2006 is "law of the case" and may not be relitigated at this juncture.[11] Although the circumstances of this procedurally unusual case do not satisfy the requirements of the formal law of the case doctrine, we nonetheless conclude that

---

[10] We agree with our colleagues in Division One that this tactic is not a particularly effective one. In *Giammarrusco v. Simon* (2009) 171 Cal.App.4th 1586, 1601-1602, the court encountered a party who took one position in his appeal but the opposite in a related appeal by his opponent. The court observed that the party "cannot have it both ways . . . . In lay terms, what is good for the gander is good for the goose."

[11] Pauline did not make this argument below. However, Stephen and Kathleen have not argued that the argument is forfeited or waived. Instead, they contend only that "[h]aving injected the no contest issue into the case, Hunt is judicially estopped to claim that the issue is not ripe for decision." Stephen and Kathleen's argument misses the mark inasmuch as the issue is not one of ripeness but rather finality. Moreover, we have the discretion to address theories presented for the first time on appeal when they present legal questions determinable from uncontroverted facts (*e.g.*, *In re Marriage of Priem* (2013) 214 Cal.App.4th 505, 510-511), and we exercise that discretion in favor of doing so here.

general principles of finality effectively render the trial court's determination that the trust became irrevocable in 2006 "law of the case." Like many courts before us, "we find no merit in [a] present attempt to relitigate matters already decided and litigate issues which could have been previously decided by this court had they been timely and properly raised." (*Wilson v. Sharp* (1959) 175 Cal.App.2d 691, 694.)

The law of the case doctrine provides that """"where, upon an appeal, the [reviewing] court, in deciding the appeal, states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal and . . . in any subsequent suit for the same cause of action, and this [is true] although in its subsequent consideration this court may be clearly of the opinion that the former decision is erroneous in that particular."' [Citation.]" (*People v. Murtishaw* (2011) 51 Cal.4th 574, 589; see also 9 Witkin, Cal. Proc. (5th ed. 2008) Appeal, § 459, p. 515.) The doctrine promotes finality by preventing relitigation of issues previously decided. (*Yu v. Signet Bank/Virginia* (2002) 103 Cal.App.4th 298, 310.) Specifically, it "prevents the parties from seeking appellate reconsideration of an already decided issue in the same case absent some significant change in circumstances." (*People v. Whitt* (1990) 51 Cal.3d 620, 638.) It extends to questions that were implicitly determined because they were essential to the previous decision, but does not apply to points of law that might have been determined but were not decided in the prior appeal. (*Sargon Enterprises, Inc. v. University of Southern California* (2013) 215 Cal.App.4th 1495, 1505.)

The law of the case doctrine, while "not inflexible" (*England v. Hospital of Good Samaritan* (1939) 14 Cal.2d 791, 795), is an imprecise fit for this case. In our previous opinion, we noted the probate court's conclusion that the trust became irrevocable in 2006 on Wayne's death. But we did not independently consider or decide that issue. The parties against whom the probate court ruled, Stephen and Kathleen, did not seek appellate review. Moreover, the date the trust became irrevocable was not necessary to

our previous ruling. Whether and when the trust became irrevocable had no bearing on the issues Pauline presented to us, which did not implicate the revocability of the trust. We accordingly conclude that the law of the case doctrine is not applicable here.

General principles of finality and appellate review nonetheless preclude relitigation of when the trust became irrevocable. In the previous appeal in this long-running case, we reversed "[t]he part of the judgment invalidating the trust amendments," directed the probate court "to enter a new and different judgment affirming the validity of the trust amendments," and affirmed the probate court's judgment "[i]n all other respects." (*Andersen*, *supra*, 196 Cal.App.4th at p. 732.) "A general or unqualified affirmance ordinarily sustains the judgment and ends the litigation. The respondent can enforce the judgment, the trial court cannot modify it, and further proceedings are improper." (9 Witkin, Cal. Proc. (5th ed. 2008) Appeal, § 853, p. 916.) Our general affirmance of "all other respects" of the judgment aside from the portion concerning the validity of the amendments necessarily included the trial court's determinations that the trust remained revocable and amendable upon Harriett's death in 1993 and became irrevocable only upon Wayne's death in 2006. After the parties exhausted all avenues of further appellate review, our opinion became final, our remittitur issued, and "the issues adjudicated by the judgment were conclusively determined." (*Ayyad v. Sprint Spectrum, L.P.* (2012) 210 Cal.App.4th 851, 861.) We therefore reject Stephen and Kathleen's attempt to reopen the issue of when the trust became irrevocable. They are bound by the previous determination that it became irrevocable upon Wayne's death in 2006. Since 2006 is "on or after January 1, 2001" (§ 21315, subd. (a)), we conclude that the current Probate Code provisions governing no contest clauses apply in this case, unless the parties can show that an exception permits otherwise.

## IV. Pauline's Appeal

Pauline concedes that the allegations Stephen and Kathleen made in their petitions filed back in 2006 and 2007 were indirect contests, which cannot trigger the enforcement of the no contest clause under the current Probate Code. She accordingly argues that her

23

petition to enforce the no contest clause against Stephen and Kathleen should be analyzed under the former Probate Code, either because section 3, subdivision (e) requires application of the former law, or because she is entitled to the fairness exception set forth in section 3, subdivision (h).  Stephen and Kathleen argue that their petitions were not direct contests and, even if they were, are not subject to the no contest clause under current section 21311, subdivision (a)(1) because they were supported by probable cause.  In the alternative, Stephen and Kathleen argue that their petitions also could not trigger enforcement of the no contest clause under the former Probate Code.  They also contend that the final judgment in the malicious prosecution case "carries res judicata effect" barring Pauline's appeal.  Although we reject their res judicata contention, we agree with Stephen and Kathleen that the current Probate Code applies and that the no contest clause therefore may not be enforced against their petitions.

## A.     The malicious prosecution suit is not res judicata.

Stephen and Kathleen contend that the judgment in the malicious prosecution suit – in favor of their attorney, John Belcher – "carries res judicata effect," apparently because Belcher was their agent.  We disagree.

"'Res judicata' describes the preclusive effect of a final judgment on the merits. Res judicata, or claim preclusion, prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them . . . .  [Citation.] Under the doctrine of res judicata, if a plaintiff prevails in an action, the cause is merged into the judgment and may not be asserted in a subsequent lawsuit; a judgment for the defendant serves as a bar to further litigation of the same cause of action." (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896-897 [footnote omitted].)  Here, even if Belcher properly may be considered to be in privity with Stephen and Kathleen, who were sued separately and obtained dismissal of the malicious prosecution suit on different grounds, the cause of action asserted in that action (malicious prosecution) is not the same as that asserted in Pauline's petition at issue here (enforcement of no contest clause).  Moreover, as the probate court cogently explained, the court in the malicious

prosecution case "was ruling . . . only on the claims of elder physical abuse or neglect," while "the claims in question [in this iteration of the probate proceedings] involve several other claims." Pauline's appeal is not barred by res judicata.

**B.     Stephen and Kathleen did not bring a "direct contest" as defined by the current law.**

Under current section 21310, a "contest" is a "pleading filed with the court by a beneficiary that would result in a penalty under a no contest clause, if the no contest clause is enforced." (§ 21310, subd. (a).) We assume for purposes of these appeals, as the parties do, that the petitions in question would result in a penalty under the trust's broadly worded no contest clause if the clause were enforced. A "direct contest" is "a contest that alleges the invalidity of a protected instrument or one or more of its terms, based on one or more of the following grounds: [¶] (1) Forgery. [¶] (2) Lack of due execution. [¶] (3) Lack of capacity. [¶] (4) Menace, duress, fraud, or undue influence. [¶] (5) Revocation of a will pursuant to Section 6120, revocation of a trust pursuant to Section 15401, or revocation of an instrument other than a will or trust pursuant to the procedure for revocation that is provided by statute or by the instrument. [¶] (6) Disqualification of a beneficiary under Section 6112, 21350, or 21380." (§ 21310, subd. (b).) No contest clauses must be strictly construed (§ 21312) and, as is pertinent here, are enforceable only against "[a] direct contest that is brought without probable cause" (§ 21311, subd. (a)(1)).

Pauline challenges the contentions Stephen and Kathleen made regarding Wayne's failure to create subtrusts and his allegedly impermissible amendments to the trust. She concedes these are not direct contests, however, and we agree. Stephen and Kathleen did not allege that the trust was invalid under any of the grounds listed in section 21310, subdivision (a). (They did allege that Wayne lacked capacity to amend the trust and that Pauline unduly influenced him to do so, but Pauline never has argued that those allegations constituted a contest. And, as discussed below, those claims were supported by probable cause.) Instead, they alleged Wayne breached the terms of the trust and his

25

fiduciary duties and sought an accounting, the recovery of trust property that they claimed Wayne impermissibly diverted, and the imposition of a constructive trust over the allegedly diverted assets. The challenged allegations in their petitions were not direct contests under the current law.

**C.    Even if the petitions were direct contests, they were supported by probable cause.**

The probate court also determined that the petitions were supported by probable cause. Pauline does not dispute this conclusion, although she contends it was "superfluous" because she was not and is not seeking relief under the current Probate Code. In our view, Judge Cowan's decision to resolve this issue was not superfluous; rather, it was prudent and thorough. Given the parties' dispute over which law to apply, Judge Cowan was wise to conduct a complete analysis.

For purposes of enforcing a no contest clause under the current Probate Code, "probable cause exists if, at the time of filing a contest, the facts known to a contestant would cause a reasonable person to believe that there is a reasonable likelihood that the requested relief will be granted after an opportunity for further investigation or discovery." (§ 21311, subd. (b).) Here, the language of the trust itself excerpted above reasonably could be read to indicate that Wayne was obligated to create two subtrusts upon Harriett's death and lacked the power to revoke or amend at least one of the substrusts. At worst, the language in these provisions was ambiguous, as the probate court found after the phase I trial. Accordingly, Stephen and Kathleen reasonably could have believed that their requested relief – an accounting, constructive trust, and return of allegedly diverted assets – would be granted.

**D.    The former law is not applicable to Pauline's petition.**

**1.    Section 3, subdivision (e) does not require application of the former law.**

Pauline contends that section 3, subdivision (e) places her petition within the ambit of the former law. We disagree.

26

Section 3 of the Probate Code "governs the application of a new law except to the extent otherwise expressly provided in the new law." (§ 3, subd. (b).) Subject to limitations provided within section 3, "a new law applies on the operative date to all matters governed by the new law, regardless of whether an event occurred or circumstance existed before, on, or after the operative date, including, but not limited to, creation of a fiduciary relationship, death of a person, commencement of a proceeding, making of an order, or taking of an action." (§ 3, subd. (c).) Pauline invokes a limitation found in subdivision (e): "If an order is made before the operative date, including an order appointing a personal representative, guardian, conservator, trustee, probate referee, or any other fiduciary or officer, or any action on an order is taken before the operative date, the validity of the order or action is governed by the old law and not by the new law. Nothing in this subdivision precludes proceedings after the operative date to modify an order made, or alter a course of action commenced, before the operative date to the extent proceedings for modification of an order or alteration of a course of action of that type are otherwise provided by statute." (§ 3, subd. (e).)

Pauline does not contest the validity of an order made or an action taken thereon before the operative date of the new law, January 1, 2010, which squarely places her petition within the ambit of the new law. We are not persuaded otherwise by her citation to *Munn v. Briggs* (2010) 185 Cal.App.4th 578, 593, fn. 5, which addressed a claim of tortious interference and simply stated in conclusory fashion that the new law did not apply to a codicil admitted to probate in 2008. We follow section 3, subdivision (d), which provides that the "contents, execution, and notice" of a document filed before the operative date of the new law are governed by the old law, "but any subsequent proceedings taken after the operative date concerning the petition, account, report, inventory, appraisal, or other document or paper, *including an objection or response*, a hearing, an order, *or other matter relating thereto* is governed by the new law and not by the old law." (§ 3, subd. (d), emphases added; see also *Donkin*, *supra*, 58 Cal.4th at p. 427.) Although Stephen and Kathleen's petitions were filed before the new law became

operative, Pauline's petition to enforce the no contest clause plainly is "an objection or response," or at the very least an "other matter relating thereto." Thus, under section 3, subdivision (d) the new law applies.

**2.     Pauline is not entitled to the fairness exception set forth in section 3, subdivision (h).**

Pauline contends that her petition should be governed by the former Probate Code. She argues that it would be "unfair" to apply the current Probate Code because it results in a different, less favorable outcome for her. She accordingly requests that we apply the "fairness exception" set forth in section 3, subdivision (h). We agree with Stephen and Kathleen that the fairness exception is not applicable here.

In *Donkin*, the Supreme Court held that the new law presumptively applies to instruments that became irrevocable after January 1, 2001, but recognized that it would be unfair to apply the new law "if application of the former law would compel a different conclusion as to enforceability of a no contest clause and it is established that the trustor(s) of the trust instrument drafted the no contest clause in reliance on the former law." (*Donkin*, *supra*, 58 Cal.4th at p. 416.) This two-pronged "fairness exception" is grounded in section 3, subdivision (h), which provides: "If a party shows, and the court determines, that application of a particular provision of the new law or of the old law in the manner required by this section or by the new law would substantially interfere with the effective conduct of the proceedings or the rights of the parties or other interested persons in connection with an event that occurred or circumstance that existed before the operative date, the court may, notwithstanding this section or the new law, apply either the new law or the old law to the extent reasonably necessary to mitigate the substantial interference." Notably, the effect of the new law was intended to be modest such that "[i]n most cases, there will be no difference in result between the former law and the current law [citation] and the fairness exception will be inapplicable." (*Donkin*, *supra*, 58 Cal.4th at p. 433.)

28

This is not an outlier case in which the outcome turns on which law is applied. Under the former Probate Code, it was possible for an indirect contest such as that levied by Stephen and Kathleen to violate a no contest clause. (Former § 21300, subds. (a) & (c).) But the former Probate Code also included a list of proceedings that "do not violate a no contest clause as a matter of public policy," including indirect contests "challenging the exercise of a fiduciary power," "regarding the interpretation of the instrument containing the no contest clause or an instrument or other document expressly identified in the no contest clause," or seeking to "compel an accounting or report of a fiduciary." (Former § 21305, subds.(b), (b)(6), (b)(9), (b)(12).)

These public policy exceptions cover the allegations Pauline challenges.[12] Stephen and Kathleen alleged that Wayne violated his fiduciary duties (former § 21305, subd. (b)(6)), sought to compel an accounting (former § 21305, subd. (b)(12)), and, like the petitioners in *Donkin*, at bottom sought an interpretation of the trust rather than to void it or set aside its distributive plan (former § 21305, subd. (b)(9)). (*Donkin*, *supra*, 58 Cal.4th at pp. 433-434). Stephen and Kathleen's allegations are virtually identical to and are indistinguishable from those asserted by the petitioners in *Donkin*, who "alleged that the accountings failed to disclose any segregation of the original trust estate into separate trusts after the death of Rodney, as required by the terms of the Family Trust instrument," and that "the successor trustees had failed to make any distribution of Decedent's Trusts B and C after the death of Mary, as required by the terms of the trust agreement." (*Donkin*, *supra*, 58 Cal.4th at pp. 434-435.) The *Donkin* court concluded that these claims, "fairly understood, . . . seek to resolve issues regarding the interpretation of the

_____

[12] To the extent Pauline challenges Stephen and Kathleen's allegations concerning the trust amendments, we agree with Stephen and Kathleen that such allegations do not trigger the no contest clause under the former Probate Code. Courts interpreting former section 21305, subdivision (a) consistently held that actions seeking to invalidate trust amendments which did not themselves contain no contest clauses did not trigger a no contest clause contained in the trust instrument. (See *Townsend v. Townsend* (2009) 171 Cal.App.4th 389, 392, 404-408; *Cory v. Toscano* (2009) 174 Cal.App.4th 1039, 1045-1046; *Perrin v. Lee* (2008) 164 Cal.App.4th 1239, 1242, 1245-1247.)

Family Trust instrument as amended by the Trust's Second Amendment." (*Id.* at p. 436.) As the *Donkin* court explained, "[a] proposed pleading concerns the interpretation of an instrument when its allegations put in issue a provision or term of the instrument that is 'ambiguous and requires judicial interpretation.' (*Cory v. Toscano*[, *supra*,] 174 Cal.App.4th [at p.] 1044 [ ].)" (*Donkin*, *supra*, 58 Cal.4th at p. 434.) That was exactly the situation here, where Stephen and Kathleen claimed that the language of the trust required one thing, Pauline claimed that the language of the trust *as amended* required another, and the probate court concluded that the challenged provisions were "contradictory, confused, indefinite, and ambiguous." The factually similar Supreme Court case of *Donkin*, is controlling; *Cook v. Cook* (2009) 177 Cal.App.4th 1436, an earlier and factually distinguishable appellate court case Pauline relies upon, is not.

We are not persuaded that the "voluminous, undisputed facts" concerning the history of hostility between Wayne and his children recited in Pauline's petition compel a different result. Regardless of the nature of their relationship with their late father, Stephen and Kathleen filed a petition that was statutorily exempt from the trust's harsh no contest clause under the former law. We accordingly conclude that the result under the former law would be the same as the result under the current law, and that Pauline is not entitled to the fairness exception.

## V. Stephen and Kathleen's Appeal

In their appeal, Stephen and Kathleen contend that Judge Penny should have granted their petition to enforce the no contest clause against Pauline because Pauline proposed "a reformation which materially altered what the trust required upon the death of Harriett Andersen." They further contend that the trust became irrevocable in 1993 and that its provisions unambiguously prohibited Wayne from revoking the B trust.

As we discussed at length above, however, the issues of when the trust became irrevocable and whether it was ambiguous were long ago resolved unfavorably to Stephen and Kathleen, who did not timely challenge them on appeal and cannot relitigate them now. We also will not consider at this juncture the related issues of whether the

probate court properly considered extrinsic evidence when interpreting the trust, whether Pauline's proposed reformation was inconsistent with the tax objectives of the trust, and whether Wayne's alleged "buyer's remorse" permitted him to amend the trust. We previously determined that the amendments were valid and affirmed the probate court's unchallenged findings regarding the ambiguity of the trust and Wayne's obligations not to amend or revoke it. (See *Andersen v. Hunt*, *supra*, 196 Cal.App.4th at p. 732.) Those rulings stand and are largely dispositive of the contentions Stephen and Kathleen raise on appeal.

To the extent our previous rulings are not dispositive, we agree with Pauline that her petition for reformation should be analyzed under the current law, which does not permit the enforcement of the no contest clause against it. We summarily reject her contention that her request for reformation was successful, however; withdrawal of a petition based on a court's tentative rulings does not render it a successful one.

## A. Pauline's petition was not a "direct contest" as defined by the current law.

Because the trust became irrevocable well after January 1, 2001, the current law presumptively applies. (§ 21315, subd. (a).) Under the portion of that law pertinent here, the no contest clause is enforceable only against "[a] direct contest that is brought without probable cause." (§ 21311, subd. (a)(1).) The petition Pauline filed – which we consider despite her subsequent withdrawal of it (see *Schwartz v. Schwartz* (2008) 167 Cal.App.4th 733, 745) – sought to reform paragraph 3.2 of the trust to conform to extrinsic evidence showing that Wayne and Harriett did not intend to create and fund two subtrusts. Her petition did not "allege[ ] the invalidity of a protected instrument or one or more of its terms, based on one or more of the following grounds: [¶] (1) Forgery. [¶] (2) Lack of due execution. [¶] (3) Lack of capacity. [¶] (4) Menace, duress, fraud, or undue influence. [¶] (5) Revocation of a will pursuant to Section 6120, revocation of a trust pursuant to Section 15401, or revocation of an instrument other than a will or trust pursuant to the procedure for revocation that is provided by statute or by the instrument.

31

[¶] (6) Disqualification of a beneficiary under Section 6112, 21350, or 21380." (§ 21310, subd. (b).) It accordingly was not a "direct contest" within the meaning of current section 21310, subdivision (b).

**B. Even if it were a direct contest, it was supported by probable cause.**

Under the current law, "probable cause exists if, at the time of filing a contest, the facts known to a contestant would cause a reasonable person to believe that there is a reasonable likelihood that the requested relief will be granted after an opportunity for further investigation or discovery." (§ 21311, subd. (b).) Here, Pauline asked the court to reform the language of the trust to comport with extrinsic evidence that she claimed more accurately reflected the trustors' intent when they established the trust. Pauline attached some of this evidence to her petition when she filed it. The second and fourth amendments to the trust explicitly supported her position at that time as well, as did Wayne's conduct during his life. Although arguably contrary to the intent expressed in the original language of the trust itself, the amendments reflected Wayne's own understanding and expression of his intent. The script from attorney Jeffers corroborated Wayne's intent as expressed in the amendments. These facts would "cause a reasonable person to believe that there [was] a reasonable likelihood" the court would reform the trust to more accurately reflect Wayne's true intent, and thus constitute probable cause. (§ 21311, subd. (b).)

**C. The former law is not applicable to Stephen and Kathleen's petition.**

As we explained above, the parties are bound by the trial court's determination that the trust became irrevocable in 2006. The key consequence of that determination is presumptive application of the current Probate Code. (See § 21315, subd. (a); *Donkin*, *supra*, 58 Cal.4th at p. 416.) Unlike Pauline, Stephen and Kathleen made no effort to overcome that presumption in their briefing by invoking the fairness exception or any other exception. Instead, they relied solely upon the untenable position that the former law applies because the trust became irrevocable upon Harriett's death in 1993. We rejected that position above and reject it here for the same reasons.

32

We do not consider whether the fairness exception nonetheless may warrant application of the former Probate Code because we are not required to make arguments for the parties. (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106.) Even if we were to reach that question, however, we would conclude that the fairness exception is inapplicable here, as the former Probate Code compels the same conclusion as the current Probate Code. (*Donkin*, *supra*, 58 Cal.4th at p. 416; see § 3, subd. (h).) Although it was possible for an indirect contest like Pauline's to violate a no contest clause under former section 21300, subdivisions (a) and (c), indirect contests "regarding the reformation of an instrument to carry out the intention of the person creating the instrument" could "not violate a no contest clause as a matter of public policy" (former § 21305, subds. (b)(11), (e)). Pauline's request for reformation of the trust to conform with what she argued were Wayne's true intentions plainly would fall within this public policy exception and accordingly would not trigger enforcement of the no contest clause under the former Probate Code. The fairness exception therefore would not warrant application of the former law.

## DISPOSITION

The orders of the probate court are affirmed. The parties are to bear their own costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

EPSTEIN, P. J.

MANELLA, J.

33